## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**James P. Perry, Jr.,**                    :          Case No. 3:06CV2541

       Plaintiff,                    :

       v.                         :          **MAGISTRATE'S REPORT AND**
                                                   **RECOMMENDATION**
**Commissioner of Social Security,**        :

       Defendant.                    :

Plaintiff seeks judicial review, pursuant to 42 U.S.C.  § 405(g), of Defendant's final determination denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U. S. C. §§ 416 (i) and 423 and for Supplemental Security Income (SSI) under Title XVI of the Act, 42 U. S. C. §§ 1381 *et seq.*  Pending are the parties' briefs on the merits (Docket Nos. 16 and 20).  Based upon the evidence that follows, it is recommended that the decision of the Commissioner be affirmed and the referral to the Magistrate be terminated.

## PROCEDURAL BACKGROUND

On November 7 and December 13, 2002, Plaintiff filed applications for SSI and DIB, alleging that he was disabled with an onset date of February 20, 2001 (Tr. 13, 36)   These applications were denied initially and on reconsideration (Tr. 84-87, 394-396; 89-91, 398-400).  At the administrative hearing conducted on September 7, 2005, by Administrative Law Judge (ALJ) Thomas Piliero, Plaintiff

represented by counsel, Medical Expert (ME) Dr. Gordon Snider and Vocational Expert (VE) Walter Bruce Walsh, Ph.D., appeared and testified (Tr. 34).  On August 19, 2006, the Appeals Council denied Plaintiff's request for review and the ALJ's decision became the final decision of the Commissioner (Tr. 5-7).  Plaintiff filed a timely action in this Court seeking judicial review of the Commissioner's unfavorable decision.

## JURISDICTION

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006).

## FACTUAL BACKGROUND

### September 7, 2005 ALJ Hearing

*Opening Comments*

Plaintiff's attorney characterized Plaintiff's disability as arising primarily from psychological problems, specifically, post traumatic stress disorders, severe major depressive disorder with impulse control problems and some physical problems (Tr. 37).

*Plaintiff's Testimony*

Plaintiff testified that he was 29 years of age, 6' tall and weighed 270 pounds.  Plaintiff was married with one child.  He completed high school with special education classes (Tr. 40-41, 42).  Consequently, he was unable to read the newspaper or count change from purchases.  He could drive.  His family's source of income was from disability benefits paid to his wife and son (Tr. 51).

Plaintiff reviewed his job history for the past fifteen years.  For one and one half months,

2

Plaintiff was employed at Pizza Hut (Tr. 53).  He was last employed for two years at a furniture store where he moved furniture, drove a truck, loaded and unloaded the furniture which he transported .  He estimated that he lifted up to 150 pounds at any given time.  His co-worker assisted him with directions when he was driving the truck (Tr. 41, 42).  Apparently Plaintiff was discharged for excessive absenteeism due to illness, specifically constant migraines (Tr. 43).

Although he could not remember the exact year,  Plaintiff was diagnosed with spinal meningitis when he was less than ten years old (Tr. 63).  Currently, his impairments included persistent migraines more prominent on the left side of his head, sharp center back pain, sharp knee pain, depression and uncontrolled anger (Tr. 43, 46, 53).  Plaintiff underwent right knee surgery in 1998 (Tr. 50).  He could not specify the pain triggers; however, the pain from the migraines radiated to his neck (Tr. 44, 54).  Migraines caused nausea, vomiting and sensitivity to light and sound (Tr. 54, 55).

Once a month, Plaintiff was treated for symptoms of depression and anger (Tr. 46, 61, 62).  Plaintiff was treated quarterly for knee pain and bimonthly for migraines (Tr. 46-47).  During a typical day, Plaintiff "sat around" and spent time with his son (Tr. 50, 59).  His inability to stand for prolonged periods of time prevented him from assisting his spouse with household chores (Tr. 58, 59).  Plaintiff had no hobbies or social interests.  He did not go to movies, ball games or restaurants (Tr. 50)

Plaintiff estimated that he could lift up to seventy pounds; however, if he wanted to avoid pain, he could only lift approximately forty pounds (Tr. 56).  Plaintiff could sit for twenty minutes before the onset of pain in his back, and he could walk approximately fifty yards before experiencing throbbing knee pain (Tr. 57).

*VE Testimony*

The VE testified that his opinion was consistent with the jobs described in the *Dictionary of*

*Occupational Titles* (*DOT*).  Plaintiff's past work as a furniture mover was performed at the heavy

exertional level.  Such work was characterized by the VE as light work (Tr. 76, 77).  Plaintiff had no

transferrable skills (Tr. 77).

    The VE further testified that Plaintiff's functional limitations would facilitate the performance of

only 70% of light, unskilled work.  Of the 90,000 available jobs, Plaintiff would qualify for

approximately 63,000 of them.  Examples included worker/assemblers, hand packers and simple

inspectors.  There were approximately 3,000, 2,200 and 2,800, respectively, such jobs (Tr. 77).  If

Plaintiff were, *inter alia*; limited to maintaining a superficial relationship with others and adapting to

simple changes, competitive work would not be realistic (Tr. 78, 79).

*ME Testimony*

    The ME suspected that the pain in Plaintiff's back radiated from the adhesions formed when he

had spinal meningitis at age five.  Other than pain, the ME opined that Plaintiff had no medically

documented physical impairments at age five (Tr. 72, 74).  The ME did not render an opinion on

Plaintiff's mental impairment, if any.  However, he was concerned that the combination of medications

prescribed to treat migraines precluded exposure to dangerous machinery, operating a truck and

ascending heights or scaffolding (Tr. 73).  He opined that Plaintiff could lift twenty pounds frequently

and fifty pounds occasionally.  Plaintiff's description of his walking and standing limitations were the

result of poor conditioning (Tr. 74-75).

## MEDICAL EVIDENCE

*2001*

    On March 8, Plaintiff was treated for gastritis (Tr. 212).  The results of X-rays of Plaintiff's

cervical spine administered on March 25, were normal (Tr. 209).  On March 27, a pain reliever was

4

prescribed for treatment of cervical neck strain (Tr. 206).  On June 7, a pain reliever was prescribed to treat tooth pain (Tr. 205).  In September, attending physician Dr. Lawrence Lewis administered a delayed release medication to inhibit gastric acid secretions (Tr. 203).  Medication was prescribed to treat migraines on December 29 (Tr. 202).

*2002*

On February 12, an antihistamine was administered intravenously to treat migraine cephalgia (Tr. 198).  The computerized tomography (CT) examination of Plaintiff's head administered in March showed normal results (Tr. 261).  Two pain relievers were administered on April 4 to treat Plaintiff's complaints of back, neck and head pains (Tr. 195).  The results from the five-view study of Plaintiff's lumbrosacral spine were unremarkable (Tr. 260).

In August, Dr. L. Misra, Ph. D., addressed Plaintiff's anger issues and his difficulty sleeping.  A sleep aid was prescribed (Tr. 342).  An x-ray of Plaintiff's dorsal spine conducted in September showed evidence of irregular end plates on some of his bones and narrowing of the margins between the intervertebral discs (Tr. 193, 258).  Dr. Sherif Yacoub treated Plaintiff for a contusion to his left middle finger on October 27 (Tr. 192).

In April, Dr. Ashok Gandhi prescribed immunotherapy to treat symptoms from atopic dermatitis and allergic rhinitis (Tr. 372).

*2003*

Dr. Michael Bomser diagnosed Plaintiff with migraines in January.  In addition to drug therapy, Dr. Bomser suggested that Plaintiff maintain a "headache diary" (Tr. 277).  In February, Plaintiff's triglyceride profile was elevated beyond the normal range (Tr. 270).  Dr. Stephen R. Sutherland recommended a treatment plan for Plaintiff's chronic headaches, including stopping smoking, reducing

caffeine, exercising and taking an antidepressant at midnight (Tr. 255).  He found no significant

hypoglycemia but he diagnosed Plaintiff with diabetes mellitus (Tr. 251, 256).  The magnetic resonance

imaging (MRI) of Plaintiff's brain was normal.  There was some evidence of sinusitis (Tr. 257).  Dr.

Gandhi discontinued immunotherapy as it was ineffective (Tr. 367).

Dr. Misra diagnosed Plaintiff with impulse control disorder and prescribed a seizure control

medication in February (Tr. 338).  In April, Dr. Misra increased the dosage of the seizure medication

(Tr. 337).  The dosage of the sleep aid was increased in September (Tr. 334).

On February 24, Dr. Bruce J. Goldsmith, Ph.D., diagnosed Plaintiff with major depressive and

anxiety related disorders accompanied by motor tension, autonomic hyperactivity and vigilance and

scanning.  Dr. Goldsmith attributed the marked distress to recurrent and intrusive recollections of a

traumatic experience (Tr. 226).  However, the degree of functional limitations resulting from such

impairments was moderate (Tr. 231).  Plaintiff was not significantly limited, *inter alia*, in his ability to

remember locations, understand and remember short and simple instructions, carry out short and simple

instructions, ask simple instructions, and maintain socially appropriate behavior (Tr. 234, 235).

Also, on February 24, Dr. William H. Noble x-rayed Plaintiff's wrist in five positions.  The

results revealed no abnormalities (Tr. 287).  Dr. Mei-Chiew Lai, a specialist in physical medicine and

rehabilitation,  performed a disability evaluation on March 20, finding that Plaintiff's subjective

complaints were not necessarily supported by the objective finding (Tr. 240).  Manual muscle testing

revealed that Plaintiff could raise his shoulders, elbows, wrists and fingers against maximum resistance

and the range of motion in his cervical spine, dorsolumbar spine, hips, knees, ankles, shoulders, elbows

and wrists was normal (Tr. 243-245).

Radiologist Jae Lee found evidence of an old surgical repair of the ligaments connecting the

6

bones of the knee joint on March 20 (Tr. 246).  X-rays of Plaintiff's thoracic spine taken in June showed

evidence of mild to moderate degenerative changes but no evidence of compression fractures (Tr. 282).

A topical cream and Tylenol were prescribed to treat a rash developed in July (Tr. 266).  The

microscopic examination of Plaintiff's gastroesophageal junction revealed the presence of rare acute

inflammatory cells and chronically inflamed fundic gastric muscosa (Tr. 267).

On September 23, Dr. William B. Schonberg, Ph. D., conducted a clinical interview,

administered the Wechsler Adult Intelligence Scale III, and the Wechsler Memory Scale III, after which

he made the following findings:

      1.     Plaintiff's full scale intelligence quotient was 76 (Tr. 292, 295);

      2.     Plaintiff had a mood disorder, borderline intellectual functioning, personality disorder, knee problems, back problems, headaches and a current global assessment of functioning (GAF) of 63.  His GAF could also be about 65 from a functional standpoint (A score of 63 or 65 is indicative of some mild symptoms (ex: depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning, but generally functioning pretty well; has some meaningful interpersonal relationships)[1];

.     3.     Plaintiff's mental ability to relate to others could be mildly to moderately impaired because of his borderline intellectual functioning and personality disorder;

      4.     Plaintiff's mental ability to understand, remember and follow directions could be moderately impaired because of his less than average intellectual functioning (Tr. 293);

      5.     Plaintiff was unable to make change from $10 or fluently subtract serial 7s.  His ability to maintain attention, concentration, persistence and pace were moderately impaired;

      6.     Plaintiff's ability to withstand stress and the pressures associated with day-to-day work activity would be moderately impaired because of his less than average intellectual functioning (Tr. 294); and

      7.     Plaintiff scored extremely low on the tests measuring his immediate, visual delayed and general memory (Tr. 296).

In October, Dr. Cindi Lynn Hill found that Plaintiff's impairment was not as severe as alleged

since his complaints lacked objective support (Tr. 297, 298).  Dr. Karen Stailey Steiger, Ph. D.,

---

[1]

AMERICAN PSYCHIATRIST ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 4th ed., Text Revision (2000).

concurred that Plaintiff had mood and personality disorders and there was evidence of pertinent signs and symptoms indicative of borderline intellectual functioning (Tr. 299, 302, 303, 306).  Plaintiff's restriction of activities of daily living was mildly limited, his difficulty in maintaining social functioning was moderately limited and his difficulty in maintaining concentration, persistence or pace was moderately limited (Tr. 309).  However, Plaintiff's ability to (1) carry out detailed instructions, (2) maintain attention and concentration, (3) ask simple questions, (4) respond appropriately to changes in the work schedule and (5) set realistic goals or make plans independently of others was moderately limited (Tr. 312, 313).

*2004*

Dr. J. T. Spare increased Plaintiff's seizure medication in January (Tr. 331).  Plaintiff failed to obtain a liver panel or obtain lab tests to measure the level of seizure medications and electrolytes in his bloodstream (Tr. 327).  Dr. Spare did opine, however, that Plaintiff was markedly impaired in (1) his ability to work in coordination with or proximity to others without being distracted by them, (2) his ability to respond appropriately to changes in a work-like setting and (3) the ability to set realistic goals or make plans independently of others (Tr. 362, 363).

In April, Dr. Aaron M. Fritz reviewed the MRI of Plaintiff's knees, noting an irritation to the undersurface of the kneecaps.  Dr. Fritz "switched" Plaintiff's anti-inflammatory medications (Tr. 316).

In June, Dr. Carmen Skinner prescribed a medication to treat the symptoms of reflux, noting that Plaintiff's hypertension was under control and his migraine cephalgia was under fairly good control (Tr. 346).

*2005*

Plaintiff was "doing well" on February 8.  Up until then, he had not seen the therapist or Dr.

8

Spare for two months (Tr. 350).  On February 9, he sought a plan to cope with his son's illness (Tr. 361).

In May, Dr. J. Blake Kellum conducted a sleep study and found a moderate amount of severe obstructive sleep apnea which becomes more severe during rapid eye movement sleep (Tr. 386)

## STANDARD OF DISABILITY[2]

To establish entitlement to disability benefits, a claimant must prove that she or he is incapable of performing substantial gainful activity due to a medically determinable physical or mental impairment that can be expected to result in death or to last for at least twelve months.  *Murphy v. Secretary of Health and Human Services*, 801 F.2d 182, 183 (6th Cir. 1986) (*citing* 42 U. S. C. § 423(d)(1)(A)).  The claimant must show that his/her impairment results from anatomical, physiological or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  20 C.F.R. §§ 404.1513, 404.1528, 416.913, 416.928 (Thomson/ West 2008).

To determine disability, the ALJ uses a five-step sequential evaluation process.  20 C.F.R. §§ 404.1520 (a) - (f) and 416.920 (a) - (f) (Thomson/West 2008).  The ALJ considers: (1) whether claimant is working and whether that work constitutes substantial gainful activity, (2) whether claimant has a severe impairment, (3) whether claimant has an impairment which meets or equals the durational requirements listed in Appendix 1 of Subpart P, Regulations No. 4, (4) whether claimant can perform past relevant work, and (5) if claimant cannot perform his/her past relevant work, then his/her RFC, age, education and past work experience are considered to determine whether other jobs exist in significant

---

[2]
The standard for disability under both the DIB and SSI programs is substantially similar.  *See* 20 C.F.R. § 404.1520 and 20 C.F.R. § 416.920 (1999).  To assist clarity, the remainder of this Report and Recommendation references only the DIB regulations, except where otherwise necessary.

numbers that accommodate him/her.  20 C.F.R. §§ 404.1520 (a) - (f) and 416.920 (a) - (f)

(Thomson/West 2008).

A finding of disability requires an affirmative finding at step three or a negative finding at step

five.  The claimant bears the burden of proof at steps one through four, after which the burden shifts to

the Commissioner at step five.  The ALJ's analysis at step five typically involves an evaluation of the

claimant's RFC to perform a particular category of work (i.e. sedentary, light, medium, heavy or very

heavy work), in combination with an application of the Grid to determine whether an individual of the

claimant's age, education and work experience could engage in substantial gainful activity.  *See* 20

C.F.R. Pt. 404, Subpart P, App. 2 (Thomson/West 2008).

## **THE ALJ'S FINDINGS**

The ALJ made the following findings:

1.  Plaintiff met the disability insured status requirements of the Act on February 20, 2001, his alleged disability onset date and continued to meet the requirements through March 2003.  Plaintiff had not engaged in substantial activity since his alleged onset date.

2.  Plaintiff had the following impairments that, in combination, reduced his ability to perform basic work-related functions:  headaches, remote history of meningitis, history of anterior cruciate ligament reconstruction of the right knee, mild to moderate degenerative disease of his thoracic spine, obstructive apnea, borderline intellectual functioning, affective  borderline intellectual functioning, affective disorder, post traumatic stress and personality disorders.  However, Plaintiff did not have an impairment or combination of impairments listed in or medically equal to the criteria of any impairment listed in Appendix 1, Subpart P, Regulations No. 4.

3.  Plaintiff's testimony concerning his ability to work was disproportionate with and not supported by the objective medical evidence.

4.  Plaintiff had the residual functional capacity to perform light exertional work, subject to the following:  (1) no lifting greater than twenty pounds frequently or fifty pounds occasionally, (2) no more than occasional bending at his waist or knees; (3) no work around hazardous materials, and (4) no operation of automotive equipment.  Plaintiff is capable of performing simple routine tasks, relating to familiar others on a superficial basis, traveling independently and adapting to simple changes in a work routine that is introduced gradually.

5.  Plaintiff was unable to perform his past relevant work.  Plaintiff, a younger individual with a high school education, had no transferrable work skills within his residual functional capacity.  Based on his capacity for a full range of light work, 20 C. F. R. § 404.1569 and 416,969, and Rule 202.21, Table No. 2, Appendix 2, Subpart P, Regulations No. 4, directed a conclusion that Plaintiff was not under a disability as defined under the Act.

6.  There were a significant number of jobs that Plaintiff could perform in the regional and national economies.

(Tr. 20-21).

## **STANDARD OF REVIEW**

Pursuant to 42 U. S. C. § 405(g), this Court has jurisdiction to review the Commissioner's decisions.  *Cutlip v. Secretary of Health and Human Services*, 25 F. 3d 284, 286 (1994).  Judicial review of the Commissioner's decisions is limited to determining whether such decision is supported by substantial evidence and whether the Commissioner employed the proper legal standards.  *Id.* (*citing Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)).  Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.* (*citing Kirk v. Secretary of Health & Human Services*, 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied,* 103 S. Ct. 2428 (1983)).  The reviewing court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility.  *Id.* (*citing Brainard v. Secretary of Health & Human Services*, 889 F.2d 679, 681 (6th Cir.1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

In determining the existence of substantial evidence, the reviewing court must examine the administrative record as a whole.  *Id.* (*citing Kirk,* 667 F.2d at 536).  If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, *See Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir.1983), and even if substantial

evidence also supports the opposite conclusion, *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc).

## **DISCUSSION**

The Magistrate construes Plaintiff's arguments as follows:  (1) the ALJ failed to attribute controlling weight to the opinions of Drs. Misra and Spare and, in the alternative, the ALJ erred in failing to explain why he discounted this evidence, (2) the ALJ erred in relying on the medical-vocational grid (Grid), and (3) the ALJ erred in failing to recontact Dr. Spare for authentication and clarification of his report.

Defendant argues that substantial evidence supports the ALJ's (1)  finding that the opinions of Drs. Misra and Spare were entitled to less weight, (2) appropriate use of the Grid in making the step five finding, (3) assessment of Plaintiff's mental limitations and 4) presentation of a hypothetical question that accurately described Plaintiff in all relevant respects.

### 1.

Plaintiff argues that the ALJ failed to attribute controlling weight to the opinions set forth in Exhibits 11 and 13 or explain why he discounted this evidence.  Plaintiff further contends that the ALJ erred in failing to include the limitations posed by Exhibits 11 and 13 in the hypothetical posed to the VE.

It is well established that the SSA will give a treating source's opinion "controlling weight" unless it is either not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with the other substantial evidence in [the] case record."  *Smith v. Commissioner of Social Security,* 482 F.3d 873, 877 (6th Cir. 2007) (*citing* 20 C.F.R. § 404.1527(d)(2)). There is a rebuttable presumption that these medical professionals are most able to provide a detailed,

longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone," their opinions are generally accorded more weight than those of non-treating physicians. *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 242 (6th Cir. 2007) (*citing* 20 C.F.R. § 416.927(d)(2)).  When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

For purposes of this decision, the Magistrate assumes that Plaintiff considered the authors of Exhibits 11 and 13, Drs. Misra and Spare, treating physicians.  The ALJ acknowledged their reports and explained that he rejected their opinions because the evidence did not support their conclusions (Tr. 17).  The record supports the ALJ's conclusion.

The Magistrate is not persuaded that Dr. Spare's opinions were discounted because he failed to sign the mental functional capacity assessment.  The record suggests that Ronnie Henson, a therapist, completed the form and submitted the report.  However, Dr Spare's entire treatment history is based on Plaintiff's reports (Tr. 323-335, 354, 356, 358).  Plaintiff recounted the stressors such as his temper, his inability to sleep and his tirades with his spouse.  Dr. Spare increased his medication based on Plaintiff's complaints.  Dr. Spare increased the dosage of sleep aid medication initially because of the side effects from the smoking cessation program.  He increased the dosage of the sleep aid because Plaintiff complained he was not sleeping well (Tr. 327, 334).  Based on Plaintiff's reports of persistent depression, Dr. Spare increased the dosage of medication prescribed for treatment of depression and anxiety (Tr. 333).  He increased the seizure medication to equalize levels of medication in his body (Tr.

13

331).  Such course of treatment was not well-supported by medically acceptable clinical and laboratory diagnostic techniques.  Thus, Dr. Spare had no medical evidence on which to assess mental residual functional capacity.  The ALJ was not required to give controlling weight to Dr. Spare's opinions.

Likewise, Dr. Misra conducted a clinical interview on August 29, 2002 (Tr. 341-342).  Over the next nine months, Dr. Misra observed Plaintiff's mood and inquired about his thoughts (Tr. 337-340).  The dosage of medication prescribed for treatment of depression was increased in response to his reports that he had bouts of anger that concerned him (Tr. 336).  The reports from these psychotherapy sessions are not controlling since the length, frequency, nature and extent of the relationship are predicated on nothing more than Plaintiff's feelings, behaviors and observations.  There was no reason for the ALJ to adopt Dr. Misra's report or opinions.

Plaintiff makes a blanket assertion that the ALJ failed to include in the hypothetical question posed to the VE, limitations found by Drs. Misra and Spare.

In fashioning the hypothetical question to be posed to the VE, the ALJ "is required to incorporate only those limitations accepted as credible by the finder of fact." *Booms v. Commissioner of Social Security*, 277 F. Supp.2d 739, 745 (E.D. Mich. 2003) (*citing Casey v. Secretary of Health & Human Services,* 987 F.2d 1230, 1235 (6th Cir. 1993)).  "[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability," and can present a hypothetical to the VE on the basis of his or her own assessment if he or she reasonably deems the claimant's testimony to be inaccurate.  *Id.* (*citing Jones v. Commissioner of Social Security,* 336 F.3d 469, 476 (6th Cir. 2003)).

The ALJ found that Plaintiff overstated his impairments and the attendant symptoms.  The opinions of Drs. Misra and Spare did not prove that Plaintiff's subjective complaints were credible.  The

14

hypothetical posed to the VE that omitted Plaintiff's subjective complaints which were incorporated in the opinions of Drs. Misra and Spare was appropriate.

2.

Plaintiff contends that the ALJ was foreclosed from using the Grid.  Consequently, Plaintiff is bound by the VE's testimony alone that there was no work that he could perform.

The claimant bears the burden of proof during the first four steps, but the burden shifts to the Commissioner at step five.  *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 548 (6th Cir. 2004) (*citing Walters v. Commissioner,* 127 F.3d 525, 529(6th Cir. 1997).  At step five, the Commissioner must identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile.  *Id.* (*citing Jones, supra*, 336 F.3d at 474). In many cases, the Commissioner may carry this burden by applying the Grid cited at 20 C.F.R. Pt. 404, Subpt. P, App. 2, which directs a conclusion of "disabled" or "not disabled" based on the claimant's age and education and on whether the claimant has transferable work skills.  *Id.* (*citing Wright v. Massanari,* 321 F.3d 611, 615 (6th Cir. 2003); *Burton v. Secretary of Health & Human Services,* 893 F.2d 821, 822 (6th Cir. 1990)).

> Where an individual has an impairment or combination of impairments resulting in both strength limitations and nonexertional limitations, the rules in this subpart are considered in determining first whether a finding of disabled may be possible based on the strength limitations alone and, if not, the rule(s) reflecting the individual's maximum residual strength capabilities, age, education, and work experience provide a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations.  Also, in these combinations of nonexertional and exertional limitations which cannot be wholly determined under the rules in this Appendix 2, full consideration must be given to all of the relevant facts in the case in accordance with the definitions and discussions of each factor in the appropriate sections of the regulations, which will provide insight into the adjudicative weight to be accorded each factor.

15

20 C.F.R. Pt. 404, Subpt. P, App. 2 (Thomson/West 2008).

If a claimant suffers from a limitation not accounted for by the Grid, the Commissioner may use the Grid as a framework for his or her decision, but must rely on other evidence to carry his or her burden. *Wilson, supra,* 378 F.3d at 548. In such a case, the Commissioner may rely on the testimony of a VE to find that the claimant possesses the capacity to perform other substantial gainful activity that exists in the national economy. *Id.* (*citing Heston v. Commissioner,* 245 F.3d 528, 537-38 (6th Cir. 2001); *Cline v. Commissioner of Social Security,* 96 F.3d 146, 150 (6th Cir. 1996)). Similarly, SSR 85-15, TITLES II AND XVI: CAPACITY TO DO OTHER WORK–THE MEDICAL VOCATIONAL RULES AS FRAMEWORK FOR EVALUATING SOLELY NONEXERTIONAL IMPAIRMENTS, 1985 WL 56857 (1985), states that where a claimant suffers both exertional and nonexertional impairments, the Grid may provide a framework for consideration. The Grid rules reflect the potential occupational base of unskilled jobs for individuals who have severe impairments which limit their exertional capacities. SSR 85-15 * 4. SSR 85-15 and 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(e)(2) address the situation in which someone suffers from two kinds of impairments-exertional and nonexertional-and they describe how the two are to be handled together. If a nonexertional limitation substantially limits a claimant's ability to perform other work, reliance on the Grid is improper. *Id.*

The ALJ properly considered whether Plaintiff could perform other work, because he "made specific reference to Grid Rule 202.21. The ALJ recognized that the Grid was not controlling and sought another vocational source in the form of VE testimony. The ALJ found that Plaintiff suffered from non-exertional limitations beyond those accounted for by the Grid so he used the Grid merely as a framework in determining that Plaintiff could perform other work. In fact, the ALJ claimed in his

16

decision that the use of the Grid was used merely as guidance tool.  Use of the Grid in this manner to reach a result that was consistent with the findings of the VE was appropriate.

The second prong of Plaintiff's argument is predicated on a finding by the Court that since he possessed non-exertional limitations that were not accommodated in the Grid, the VE's testimony that there was no work that he could perform was dispositive.  The Magistrate is not persuaded that the VE's testimony is dispositive that there are no jobs that Plaintiff could perform.  Plaintiff mischaracterizes the VE's testimony.  In response to the hypothetical question posed by Plaintiff's counsel including the evidence adduced in Dr. Spare's reports, the VE testified that based on his limitations, competitive work activity "would not be realistic" (Tr. 79).  When Plaintiff's counsel asked that the VE consider Plaintiff's residual functional capacity in conjunction with the findings of Drs. Spare, Gandhi and Drake his response was "the same" (Tr. 79-80).  Such responses are relevant to employability not Plaintiff's ability to engage in work activity.  The Commissioner does not consider employability when determining if the plaintiff is disabled.  *See Casey v. Secretary of Health and Human Services*, 987 F. 2d 1230, 1235 (6th Cir. 1993).  Accordingly, the VE's response was not relevant to the Commissioner's charge of identifying a significant number of jobs in the economy that would accommodate Plaintiff's residual functional capacity and vocational profile.

3.

Plaintiff's third argument is that the ALJ should have performed further investigation by contacting the treating source, Dr. Spare, to obtain his signature on the mental residual functional capacity assessment form or clarify his report.

Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator

17

cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the treating source for clarification of the reasons for the opinion. TITLES II AND XVI: MEDICAL SOURCE OPINIONS ON ISSUES RESERVED TO THE COMMISSIONER 1996 WL 374183, *6, SSR 96-5p (July 2, 1996).  "Every reasonable effort" is defined in 20 C.F.R. § 404.1512 as an initial request for evidence from the treating source and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, one followup request to obtain the medical evidence necessary to make a determination.

Clearly the finding of residual functional capacity is reserved for determination by the Commissioner.  However, the basis of Dr. Spare's opinion is quite clear.  From their conversations, Dr. Spare gleaned that the only responsibility Plaintiff had was caring for his son; otherwise, Plaintiff sat all day, struggled with his temper and/or anger, became irritated easily, slept with difficulty and had difficulty engaging in conversation (Tr. 327, 330, 331, 332, 333, 335).  It was reasonable for Dr. Spare to conclude that Plaintiff would suffer marked limitations in his ability to work with others without being distracted by them, he could not accept instructions or criticism from a superior, get along with others, respond appropriately to changes in the work setting or set realistic goals.  However, there was nothing in the record remotely related to a diagnostic or clinical determinations that support Dr. Spare's diagnosis and prognosis.  It is easy to ascertain the basis of the opinion from the case record and there is no ambiguity about the source of Dr. Spare's opinions.  Even if Dr. Spare signed the report and proffered it for the medical record, Dr. Spare did not conduct any clinical and/or diagnostic techniques.  The results would still be of little probative value in assessing mental disability.  Under these circumstance, recontacting Dr. Spare to obtain authentication and clarification would be futile.  The Magistrate is not persuaded that the ALJ erred in failing to recontact Dr. Spare.

18

## CONCLUSION

In view of the foregoing, the Magistrate recommends that the Commissioner's decision be affirmed and the referral to the Magistrate be terminated.

/s/ Vernelis K. Armstrong
United States Magistrate Judge

Dated:  February 12, 2008

## NOTICE

Please take notice that as of this date the Magistrate's Report and Recommendation attached hereto has been filed.

Please be advised that, pursuant to Rule 72.3(b) of the Local Rules for this district, the parties have ten (10) days after being served in which to file objections to said Report and Recommendation.  A party desiring to respond to an objection must do so within ten (10) days after the objection has been served.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.

19